1818.

M'MENOMY
v.
ROOSEVELT.

---

### M'MENOMY *against* ROOSEVELT and others.

A debtor in failing circumstances, or insolvent, may, *bona fide*, prefer one credit-
or to another. A conveyance by a debtor of his property, to secure a *bona
fide* creditor, executed prior to the 1st of *June*, 1800, though made in con-
templation of bankruptcy, is valid, not being within the purview of the
bankrupt law of the *United States*, of the 4th of *April*, 1800, which did not go
into operation until after the 1st of *June* following, nor fraudulent at common
law.

*June* 12th, 13th,
15th, and *Sep-
tember* 28th.

*MARK & SPEYER* were partners in trade, in the city
of *New-York*, and, by articles, dissolved their copartner-
ship in *August*, 1799. Certain tracts of land belonged to
them, at the time of the dissolution, the legal title to which
was vested in *M.* One of these tracts was conveyed in
*December*, 1799, to *John Murray*, *in trust*, to secure cer-
tain *German* creditors; (see the last case.) The bill of the
plaintiff stated, that *M. & S.* had ceased their ordinary
mercantile business, in 1799, and were insolvent; and that,
in contemplation of bankruptcy, *M.*, in whom the legal
title to the real estate of the copartnership was vested,
on the 1st of *March*, 1800, gave a bond to *John Murray*,
for 6,000 dollars, with a warrant of attorney, and a mort-

gage on land in *Oneida* county, to secure the same, the object of which was to provide money for *M. & S.* in case of their imprisonment, and to exempt their lands from execution. That judgment was entered up on the bond, the 19th of *April*, 1800; that, on the 15th of *April*, 1800, *Mark* executed a deed to *Samuel Jones, jun.*, and *Solomon Townsend*, of their lands, except those on *Lake Champlain*, all of which were under incumbrances; that *M.*, at the same time, executed a judgment bond, conditioned to pay *J. & T.* 100,000 dollars, and that the judgment thereon was docketted the 19th of *April*, 1800. That the deed and judgment were without consideration, and in *trust* for *M. & S.* to keep their lands, under their own control, and with a view to hinder and defraud their creditors. That on the 31st of *May*, 1800, *M. & S.*, in contemplation of bankruptcy, executed divers instruments, some of which were merely colourable, and others pretended to be for the security of certain creditors; that *S.* executed a bill of sale of his furniture to *John Murray*, and retained the possession, and afterwards agreed to pay the plaintiff, who had sued them for this furniture. That *S.* also, about the same time, conveyed to *Murray* two lots in *New-York*, for the consideration of five hundred dollars, but in trust, after payment of that sum, to secure a pretended debt due to his father; also, a share in the Tontine coffee house; a bond of one *J. C. F. R.* for 620 dollars, and a note of *Bainbridge* for 204 dollars, in trust for the same purpose. That *S.* received the dividend of the Tontine share, and the other things assigned are held for his use. That *M.* also, transferred a share in the Tontine coffee house to his nephew, but for his own use. That on the same 31st of *May*, 1800, *M. & S.* executed a deed, which recited the conveyance and judgment to *J. & T.*, the insolvency of *M. & S.*, and that *J. J. Roosevelt* had lent them money, and endorsed their notes, believing them to be solvent, and that they thought it their duty to secure him, in preference

to other creditors, and it was, therefore, *declared,* that the said conveyance and judgment were intended to secure *R.*, and the surplus for all their creditors, except those in *Europe;* and in case of any commission of bankrupcy or proceedings under the insolvent act, and assignment under them, the trustees, *J.* and *T.*, were to retain a sufficient sum to indemnify *R.* before they conveyed to the assignees, and were not to convey until such satisfaction, unless compelled by law so to do. That this deed, the provisions of which were long and numerous, was made to delay creditors. That *M. & S.* who had been marine insurers, on the 13th of *June,* 1800, gave an authority to *John Ferrers,* their agent, to pay to *R.* all monies he should receive, and which *F.* agreed to do. That *M. & S.* in *July,* 1800, committed an act of bankruptcy, upon which a commission was issued, and they were declared bankrupts under the act of the *United States;* and the plaintiff and *S. Townsend,* were appointed assignees. That parts of the lands so conveyed to *J.* and *T.* and to *M.*, had been sold under succeeding incumbrances, That 27,610 acres of land were unincumbered, which the plaintiff alleged ought to be distributed under the commission. That *R.* and *M.* knew of the insolvency of *M. & S.* at the time of the said conveyances. Prayer for a discovery, and that the conveyances and judgments to *J.* and *T.* and to *Murray* might be declared fraudulent and void, as against the plaintiff; and that they may be assigned to him, in trust, for the creditors of *M. & S.* and for an account of moneys received under the assignments, &c. &c.

The answers of the defendants contained a full detail, as to all the transactions of *M. & S.* and the matters charged in the bill. *R.* stated, that, at different times, between 1796 and 1799, he lent money to *M & S.*, endorsed notes for them, and became their surety to a large amount, without any consideration. That under a promise of payment and indemnity by *M & S.*, he paid a number of his endorsements out of his

own funds. That he applied for security, and under a promise of it, made further loans and endorsements. That *M. &* *S.* dissolved partnership on the 5th of *August,* 1799, and *M.* was to take all the partnership property, and pay all the debts, and to pay *S.,* who was to keep his separate property, 10,000 dollars. That in *October,* 1799, the defendant *R.* applied to *M.* for the security which had been promised, who proposed to give a judgment bill for 50,000 dollars, payable in 60 days; and on the 10th of *December,* 1799, executed such a bill, which the defendant lodged with *N. J. R.* as his trustee, to be used as he directed. That in *March,* 1800, *N. J. R.* on being applied to, refused to give him the judgment bill, because, if used, it might produce a sacrifice of the property of *M.* That the defendant *R.* then applied to *M.,* and complained to him of this refusal, who promised to give other security. That in the beginning of *April, J.* was instructed to prepare the conveyance to *J. & T.* of the *Oneida* lands, and the judgment bond to *J. & T.,* and which were executed on the 15th of *April,* 1800. The deed was recorded the 24th of *April,* 1800, and the judgment docketted the 19th of *April,* 1800. That on the 31st of *May,* 1800, *M.* and the trustees, *J. & T.* executed *a declaration* of *trust,* reciting the *deed* and *judgment* bond, &c., that *R.* had made advances, and incurred responsibilities for *M. & S.* at their request, and on the faith of their solvency, and that *M. & S.* had always considered themselves bound to give him security, in preference to other creditors. That *S. T.* was a creditor of *M. & S.,* but was to have no preference, &c. And the deed then declared the trusts to be, (1.) to pay the charges of the trust; (2.) for the security and payment of *R.* of all moneys lent or paid by him, or afterwards to be paid, on existing responsibilities, for, or on account of *M. & S.* or either of them; (3.) to pay the surplus, rateably, to the *American* creditors of *M. & S.,* &c. (4.) That all the *American* creditors be allowed to the 1st of *January,* 1801.

1818.

M'MENOMY
v.
ROOSEVELT.

to take the lands in full of their debts, and release *M. &
S.;* and if so, the trustees to release to them, subject to the
incumbrances, &c., provided the creditors paid *R.* for all
his advances, and indemnified him against his responsibili-
ties, and the trustees to sell the lands, and deduct out of
sales, first to pay *R.*, &c. (5.) That if, pending the trust,
a commission of bankruptcy issued against *M. & S.*, and
they should assign their property under such act, or under
an insolvent act of this state, the trustees might assign to
such assignees under the commission of bankruptcy or in-
solvent act, retaining, however, sufficient of the trust fund,
or premises, to pay and indemnify *R.*, and they were not
to assign until he was so paid and indemnified, unless com-
pelled by law to do so. (6.) That the trustees had power
to sell the lands held in trust, on such terms as they should
judge best, and to sue out a *fi. fa.*, but not a *ca. sa.*,
against *M.* on the judgment. (7.) That the trustees should
have power to settle debts, or to refer them to arbitration,
and to convert moneys in stock, and to make partition,
&c. &c.

The answer farther stated, that the declaration of
trust was recorded in *Oneida* county, the 26th of *June*,
1800, and that the deed, judgment, and declaration
of trust, were, in substance, agreed on by *M. & S.* prior to
the 15th of *April*, 1800, under the advice of *J.*, and were
made to carry into effect the agreement of *M.*, to give *R.*
security, and for the purposes therein declared. The de-
fendant, *J.*, said, that he considered himself a trustee from
the 15th of *April*, 1800, upon the terms of the original
agreement, and would, at any time, have executed a de-
claration of trust on the request of *R.*, and that the deeds
and securities were all made in consideration of the ad-
vances and engagements of *R.* for *M. & S.*, and for his
security and indemnity, according to previous assurances
made to him, on his application for security.

The answer farther stated, that *J. Ferrers* (since dead) was agent of *M. & S.* as insurers, who, on the 13th of *June*, 1800, gave *R.* an order on him for all moneys coming to his hands, &c., which was accepted by *F.* That *F.*, after the bankruptcy of *M. & S.*, having, as their agent, received 750 dollars, the assignees of *M. & S.* brought an action against *F.* in the *Mayor's Court* of *New-York*, to recover the money, when a verdict was found for the defendant. A new trial having been granted, the cause was removed to the *Supreme Court*, and tried in *April*, 1806, when a verdict was found for the defendant. That the cause was defended on its merits, by *R.*, and all the deeds, assignments, judgments, and securities, above mentioned, charged to be fraudulent, were produced in evidence to the jury, and *M. & S.* examined as witnesses; and that the Supreme Court, on motion of the plaintiffs for a new trial, refused to set aside the verdict.

It was admitted, that suits were pending against *M. & S.*, in 1800, and noticed for trial on the 25th of *March*, but not tried; and that nine judgments were docketted against *M. & S.* between the 19th of *April* and 10th of *May*, 1800. That *M. & S.* became bankrupts on the 11th of *July*, 1800.

The defendants averred, that all the conveyances, assignments, &c., were *bona fide*, and made to secure just debts due to creditors, except the share in the *Tontine Coffee House*, which was in the name of *M.*, who had no interest in it, being a mere naked trustee for his nephew, *L. M.*, who was an infant, and who, after the transfer to him, on the first of *August*, 1799, received the dividends.

It was agreed by the counsel, that the facts in the case in the Supreme Court, of *M'Menomy* v. *Townsend*, (see 3 *Johns. Rep.* 71.) except the documents, and the evidence in the last case, of the same plaintiff against *Murray*, (ante, p. 435-439.) should be admitted as evidence in this case.

Vol. III.                58

1818.          *N. Pendleton* and *T. A. Emmet*, for the plaintiff. They
cited 3 *Johns. Rep.* 61.   6 *Bro. P. C.* 491.

M‘MENOMY
v.
ROOSEVELT,      *S. Jones*, jun. and *Wells*, contra. They cited *Ogden* v.

June 12th,    *Jackson*, 1 *Johns. Rep.* 370.   *Phoenix* v. *Assignees of In-*
13th, and 15th.  *graham*, 5 *Johns. Rep.* 512. (a)

*September 28th.*   The cause stood over for consideration until this day.

THE CHANCELLOR.  The object of this bill is to set
aside the deed to *Jones & Townsend*, of the 15th of *April*,
1800, and the judgment in their favour, which was en-
tered up and docketted on the 19th of *April*, 1800.  The
deed was given, and the judgment confessed by *Mark*,
to secure the defendant *Roosevelt*, for advances made, and
responsibilities incurred for *M. & S.*

The objection to the validity of these securities is, that,
1. They were given with intent to delay, hinder, and de-
fraud creditors; and, 2. That the were given in contem-
plation of bankruptcy, and in fraud of the bankrupt act
of the *United States.*

1. *Roosevelt* was a *bona fide* creditor of the house of
*M. & S.* on the 1st of *January*, 1800, to a large amount,
if we include all his loans and engagements for them.  He
had long before, or between 1795 and 1799, become their
surety and endorser, and also accommodated them with
loans; and it appears, that when he first became their
surety, he was promised security, and indemnity.  After
repeated applications, he obtained, in *December*, 1799,
from *Mark*, who had assumed all the debts, and taken all
the property of the house of *M. & S.*, a sealed note for
50,000 dollars, with a warrant of attorney to confess judg-
ment.  But the note was placed in the hands of a third

(a) Vide also *Wilt* v. *Franklin*, 1 *Binney*, 502.  *Lippincot* v. *Barker*, 2 *Bin-
ney*, 174.  *M‘Allister* v. *Marshall*, 6 *Binney*, 338.  *Murray* v. *Riggs*, 15
*John's. Rep.* 571. in *Error*.  S. C. 2 *Johns. Ch. Rep.* 565.

person, (*Nicholas J. Roosevelt,*) at the request of *M.*, who afterwards refused to give it up, to have judgment entered upon it. It accordingly ceased to be any security to the defendant, and the defendant then renewed his applications to *M.* for other and better security. In the beginning of *April*, 1800, *M.* agreed to give farther security to the defendant, *R.*, by *vesting lands in Jones* and *Townsend*, as trustees, for his reimbursement and indemnity. The deed and judgment bond were accordingly prepared and executed on the 15th of *April*, and the object was to give the defendant *R.* a preference, in consequence of his disinterested loans and engagements for *M. & S.*, and their long previous promise to secure him. The terms of the trust were then agreed upon, and after the defendant *R.* was satisfied, the surplus property so to be secured, was to be appropriated to the discharge of the debts of the other *American* creditors. The declaration of trust was not executed until the 31st of *May* following, which delay arose, according to the testimony of *Jones*, the trustee, from accident and the pressure of other business. There can be no doubt but that the declaration of trust in *May* was only a written and more authentic evidence of the terms and conditions of the trust agreed upon by the parties, at the execution of the deed and judgment bond in *April;* and *Jones* says, he considered himself such a trustee from the execution of the deed.

Upon what grounds can it be contended that these securities were fraudulent, within the statute of frauds? They were not made for the purpose of defeating executions, but to secure the defendant; and *M.* felt himself under the most pressing obligations to give *Roosevelt* a preference. It is not now to be denied, as I have frequently had occasion to say, and generally with regret, that a debtor in failing circumstances, and even avowedly insolvent, may give such preference; and the only question is, was this a *bona fide*, or only a covenous prefe-

rence for fraudulent purposes? There can be no just pretence for that inference.

A number of other acts of *M. & S.* have been stated from which evidence of a general fraudulent design has been attempted to be deduced; but they have no necessary connection with this case, and ought not to affect the rights of the defendant *R.* under these securities, created for a valid and meritorious purpose. I do not, however, believe there was any actual fraud or a fraudulent intent in any of the proceedings of *M. & S.* They secured their *German* creditors by one deed in trust, founded on original promises made at the creation of the debt. They gave the defendant a preference founded on a like original promise, and then the surplus of that very property was to go to all their other *American* creditors. These unfortunate debtors had invested a great proportion of their capital in wild and unproductive lands, and their efforts in 1799 and 1800, were to save their property, as much as possible, from useless and ruinous sacrifices, for the very purpose of enabling it to pay all their debts. The most unfavourable act that *M.* did, was giving the bond and mortgage to *Murray* for 6,000 dollars, but its object at that time was one of self preservation and necessity. It was to enable him to live while in prison, and to have the ability to manage his extensive and complicated concerns for the settlement of his debts. The act was dictated by an anticipated necessity, and as the necessity did not occur, the act was rescinded, and the bonds never made use of.

The bills of sale of the furniture of *M. & S.* were fraudulent only in judgment of law, because of the indulgence of the trustees in allowing the grantor to keep possession. They were made to pay creditors, and I do not perceive the evidence of fraud in fact, or how they can or ought to affect the trust deed resting on a fair and valuable consideration.

Some stress was laid, also, upon the assignment of a share in the Tontine Coffee House, as if that was merely colourable on the part of *M.* This appears to be a most unfounded surmise; the share always belonged to *Lewis Mark*, a nephew of *M.*, and for whom he acted as trustee, in consequence of his infancy.

I have carefully examined all the transactions on the part of *M. & S.*, and the details as stated in the answers, and I have been struck with the candour of the narration, and the close correspondence between the answers and the proofs. I should deem it a misfortune to be obliged to draw the conclusion of fraud, in this case, after the lapse of so many years, and when several of the actors are dead, and *when two distinct juries have passed upon the case, and contradicted the charge.* Indeed when I consider that these deeds and assignments in trust were all prepared under the direction and advice of Mr. *Jones*, one of the trustees for *Roosevelt*, it would be difficult for me to believe that fraud could have been devised and matured by the debtor, and yet have escaped the observation of an agent so incapable of aiding, and yet so capable to detect it.

2. The next point is, whether the deed and judgment were void, because given in contemplation of bankruptcy.

The first point embraced the consideration of the question of actual fraud. This only relates to a technical fraud, or an act done to defeat the equality of the bankrupt law.

The bankrupt act of the *United States*, was passed on the 4th of *April*, 1800 ; and the first section declared that, "from and after the 1st day of *June*, then next, if any merchant should, with intent unlawfully *to delay or defraud his creditors*, depart from the state, or conceal himself, &c., or fraudulently procure himself to be arrested, or his property taken in execution, or secretly convey away or conceal his goods, *or make any fraudulent conveyance of his lands or chattels, or make or admit any*

*false or fraudulent security,* or evidence of debt, &c. every such person shall be deemed and adjudged a bankrupt.

These acts of bankruptcy include the very acts charged upon *M.* by the plaintiff, and yet the statute expressly confines its operation to such acts committed "from and after the 1st of *June.*" If such acts as those enumerated, are not within the purview of the bankrupt act, though committed on the 1st of *May,* then surely an honest preference given to a creditor, on the 15th of *April* preceding, cannot come within the reach of the act. There is no reason why a preference given even in contemplation of bankruptcy should fall within the act, when a fraudulent concealment or conveyance of property will not. The latter mischief is direct and great, and involves moral turpitude. The other act is innocent and just, but breaks in upon the policy of the law.

The 10th section of the act has the same meaning as the first, when it declares, that the assignment shall be good against the bankrupt, and "all persons claiming by, from, or under, him, by any act done at the time, or after he shall have committed the act of bankruptcy." The 17th section seems to be retrospective, and to allude to acts of the bankrupt done "prior to his becoming a bankrupt;" but it only applies to conveyances of property "with intent to defraud creditors," and gives to the commissioners power to assign property so conveyed; and such conveyances are void at common law. If conveyances of property made merely in contemplation of bankruptcy were to be affected by the act, though done prior to the first of *June,* or, in the words of this section, "prior to his becoming a bankrupt," we should have had some express provision, as in the other case. Nothing can be clearer, than that the bankrupt act ought not to be construed to control acts done prior to the day on which it was to go into operation. It would require a very express

provision to give it such a retro-active effect, because it is repugnant to another express provision.

The case of *Vickars* v. *The Atty. Gen. of Ireland,* (6 *Bro. P. C.* 491.) was mentioned by one of the counsel for the plaintiff. In that case certain tobacco was imported, on the 28th of *December,* 1771, and the existing duties paid. On the 1st of *January,* 1772, a statute passed, imposing an additional duty, and on information filed, the importer was held to pay that additional duty, for the intention of the legislature was known, as the vote on the bill had passed the House of Commons on the 21st of *December.* The decision strikes me as unfounded in principle; and it cannot be justified on any other ground than the one taken in support of it, and which is, that where no particular time is specified, a statute does, by legal relation, take effect from the first day of the session. And *that* rule was abolished by the statute of 33 *Geo.* III. c 13., from "its great and manifest injustice," as the preamble in that statute stated.

The plain rule in this case is, that the debtor was left free to act, according to the existing law of the land, down to the day on which the bankrupt act was to control and govern the conduct of the merchant. That day was expressly declared to begin "from and after the first of *June,*" and the statute had nothing to do with his prior conduct, except in the specified cases. This is the only safe and practicable doctrine, and therefore we have no concern with the question, whether the deed of the 15th of *April* was done in contemplation of bankruptcy. It is immaterial whether or not it was done under that impression, if it was not done in fraud of the rights of creditors. And if that was truly the inquiry in this case, I should incline to think the deed good, because it was founded on a prior engagement, made at the time, to give to *R.* security for his loans and name. It was the condition on which the responsibility was incurred. The engagement was found-

ed on a good consideration, and was binding in conscience; a conveyance in preference, founded on such an agreement, and in fulfilment of it, would probably be good, though bankruptcy were contemplated when the conveyance was made.

This doctrine of contemplation, in cases of bankruptcy, ought not to be pressed with too much force, seeing we have nothing, either in the common or statute law, to show what it is. This was admitted by the judges, in *Fidgeon* v. *Sharpe*. (5 *Taunton*, 539.) The cases make it to depend upon the *quo animo*. The act must be done with *intent* to contravene the bankrupt laws. It cannot be in fraud of the bankrupt laws, unless the actor meant it should be so. It is a question of fact. A man may be in difficulties, and not stop payment; he may stop payment, and not be insolvent; and he may be insolvent, and not be a bankrupt. There is a distinction between bankruptcy and insolvency; and the court of C. B., in the case I have last referred to, forbear to decide whether the contemplation of *insolvency only*, will prevent a trader from giving a preference to one creditor over another.

My opinion upon the case is, that the deed of the 15th of *April*, to *Jones & Townsend*, and the judgment in their favour of the 10th of *April*, are to be deemed valid securities, for the purposes declared in the declaration of trust of the 21st of *May*, and there is, consequently, no foundation for the bill. If, however, the plaintiff shall deem a reference material, in respect to the demand of the defendant *Roosevelt*, and the state of the property so held in trust, he is at liberty to have it, within thirty days, otherwise the bill must stand dismissed.

Decree accordingly.